**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**REBECCA VEST,**

       **Plaintiff,**

**v.**                             **Case No.: 2:15-cv-05886**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 9).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment

on the pleadings be **GRANTED;** that the decision of the Commissioner be **AFFIRMED;** and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On April 30, 2012, Plaintiff, Rebecca Vest ("Claimant"), completed an application for DIB, alleging a disability onset date of April 23, 2012, due to "osteoarthritis and tendonitis." (Tr. at 129, 161). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 12). Claimant filed a request for an administrative hearing, which was held on November 7, 2013, before the Honorable Stanley Petraschuk, Administrative Law Judge ("ALJ"). (Tr. at 26-51). By written decision dated January 27, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-22). The ALJ's decision became the final decision of the Commissioner on March 10, 2015, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 5, 6), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 9, 10). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 52 years old at the time she filed the instant application for benefits, and 54 years old on the date of the ALJ's decision. (Tr. at 129). She had a high school education and communicated in English. (Tr. at 160, 162). Claimant's past relevant work was as a postal clerk for the United States Postal Service. (Tr. at 162).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 23, 2012. (*Id.,* Finding No. 2). Although Claimant's earnings record revealed income after the alleged disability onset date, Claimant testified that this income was payment for accumulated unused sick and vacation days. (*Id.*). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "generalized osteoarthritis and obesity." (Tr. at 14-15, Finding No. 3). At the third step, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-16, Finding No. 4). Consequently, the ALJ determined that Claimant had:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b). She can occasionally climb ramps and stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, or crawl. She must avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as heights and moving machinery.

(Tr. at 16-19, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform her past relevant work. (Tr. at 19-20, Finding No. 6). At the fifth and final step, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1959 and was defined as an individual closely approaching advanced age; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 20, Finding Nos. 7-9). Given these factors, Claimant's RFC, and with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 20-21 Finding No. 10). At the unskilled light exertional level, Claimant could work as a hand packer, laundry worker, or assembler; and at the unskilled sedentary level, Claimant could work as an order clerk, charge account clerk, and small parts assembler. (Tr. at 21). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 21, Finding No. 11).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises two challenges to Commissioner's decision. First, Claimant asserts that the ALJ failed to comply with the applicable Social Security regulation in assessing the opinion of Dr. Rakesh Wahi, an agency consultant who examined Claimant. After concluding his evaluation of Claimant, Dr. Wahi opined that Claimant was "unable to do sustained physical activity," but could "function part-time in a light setting." (Tr. at 245). Claimant argues that Dr. Wahi was the only physician to examine Claimant; accordingly,

5

the ALJ had no basis upon which to reject Dr. Wahi's findings. Claimant contends that the ALJ improperly substituted his personal judgment for that of a medical expert in violation of governing legal standards. (ECF No. 7 at 8-9).

Second, Claimant asserts that the ALJ's assessment of her pain and credibility was plainly deficient. (*Id.* at 9-12). Although the ALJ acknowledged his responsibility to evaluate Claimant's statements regarding the severity, persistence, and intensity of her pain using seven factors outlined in Social Security Ruling ("SSR") 96-7p, the ALJ performed only a superficial analysis. Moreover, according to Claimant, the ALJ failed to supply the requisite explanation for his decision to afford Claimant's statements less than fully credibility. Claimant argues that the ALJ mischaracterized her statements and gave undue weight to his perception that a lack of objective medical evidence indicated the absence of pain.

In response, the Commissioner states that the ALJ properly discounted Dr. Wahi's opinion because it was based largely upon Claimant's subjective statements. Furthermore, the ALJ relied upon opinions by other agency experts, who reviewed Claimant's case file and found her capable of performing light work with some non-exertional restrictions. The Commissioner stresses that weighing the evidence and the opinions is the function of the ALJ, not the parties or the Court.

With respect to the credibility analysis, the Commissioner maintains that the ALJ provided clear and appropriate reasons for finding Claimant to be less than fully reliable when describing her symptoms. In part, the ALJ considered the lack of supporting medical evidence, but in addition, the ALJ noted Claimant's daily activities, which were inconsistent with disability. The Commissioner disagrees with Claimant's contention that the ALJ mischaracterized her statements, indicating that the ALJ simply took note of

6

various comments provided by Claimant in her Adult Function Report. In sum, the Commissioner argues that notwithstanding Claimant's pain-related limitations, which were fully addressed in the RFC finding, substantial evidence supports the conclusion that Claimant is capable of performing work-related activities on a sustained basis.

## V.   Relevant Medical History

The undersigned has reviewed all evidence of record and summarizes the medical information below:

### A. Treatment Records

On January 25, 2012, Claimant presented to Dr. John Snyder of Jackson Internal Medicine, complaining of left shoulder, left upper arm, and right ankle pain, which had been present for eight months. (Tr. at 250). Although most of Dr. Snyder's handwritten notes are illegible, a diagnosis of osteoarthritis is decipherable. Dr. Snyder wrote a note for Claimant stating that Claimant needed to limit her work to two evenings weekly for three months secondary to arthritis and pain. (Tr. at 257). Dr. Snyder also ordered an EMG, x-rays of Claimant's knees, and prescribed Mobic, a nonsteroidal anti-inflammatory pain reliever. (*Id.*). The x-rays were completed on January 17, 2012 and revealed moderate degenerative changes in the left knee and mild to moderate degenerative changes in the right knee. The EMG was performed by Dr. Glenn Goldfarb on February 6, 2012 and showed a prolonged left median latency across the wrist, indicating mild left wrist carpal tunnel syndrome. (Tr. at 255).

On April 9, 2012, Claimant requested that Dr. Snyder complete a physician certification for her return to work on light duty. (Tr. at 249). Claimant reported that she was having bilateral ankle, knee, and feet pain, as well as left wrist, elbow, and shoulder pain. She was working two days per week, but was considering disability. Dr. Snyder wrote

an "off work" slip for Claimant, stating that she could return to work on April 12, 2012. (Tr. at 253). The following day, he completed a Return to Work/Light Duty Medical Certification form for Claimant. (Tr. at 254).

X-rays of Claimant's feet and left wrist were taken on April 23, 2012. (Tr. at 251). The films showed no evidence of fractures, dislocations, or lytic lesions. However, minimal degenerative changes were seen in Claimant's feet, and minimal changes secondary to osteoarthritis involving the first MCC joint were observed in Claimant's left wrist. (*Id.*).

Claimant presented to Dr. Snyder's office on June 11. 2012, requesting information about her April x-rays. She returned on July 31, 2012 for follow-up of her arthritis. (Tr. at 270-71). However, in both instances, Dr. Snyder's notes are undecipherable.

### B.  Evaluations and Opinions Regarding Functional Capacity

On February 7, 2012, Dr. Snyder completed a Certification of Health Care Provider for Employee's Serious Health Condition (Family Medical Leave Act "FMLA") form on behalf of Claimant. (Tr. at 260-63). The form was prepared to support a request made by Claimant on October 31, 2011 for leave from work under the FMLA. (Tr. at 267). In the form, Dr. Snyder stated that Claimant's condition commenced in August 2011, and he had treated her for it on October 18, 2011. (Tr. at 261). She was not hospitalized and had not received any prescription medication; nonetheless, Dr. Snyder had discussed the possibility of surgery with Claimant. Dr. Snyder described Claimant's condition as "osteoarthritis and carpel tunnel bursitis." He stated that when Claimant had flare-ups, she needed to take time off from work. Dr. Snyder estimated that a flare-up would last 3-5 days. He also attempted to provide an opinion on the frequency of flare-ups; however, the opinion he provided made no sense. (Tr. at 262). The opinion could be interpreted as

once every twelve months or four to six times per month, which are decidedly different opinions. At some point, Dr. Snyder wrote a note "to whom it may concern," recommending that Claimant's FMLA coverage be extended to November 3, 2012. (Tr. at 252).

On April 10, 2012, Dr. Snyder completed the Return to Work/Light Duty Medical Certification form for Claimant. (Tr. at 254). Dr. Snyder indicated that Claimant currently had pain in her knees, feet, and wrist. She was diagnosed with osteoarthritis of the knees; degenerative joint disease; and tendonitis of the wrist. He noted that she had experienced limited progress to date. Claimant took ibuprofen for pain relief, but had not been hospitalized and was not scheduled for surgery, or other future treatment. (*Id.*). He opined that Claimant could safely return to light duty without hazard to herself or others with the following restrictions: occasional bending, occasional standing and walking, and to limit lifting to thirty pounds or less. Dr. Snyder stated that these restrictions were permanent. (*Id.*).

On June 18, 2012, Claimant was evaluated by Dr. Rakesh Wahi at the request of the SSA. (Tr. at 242-45). Dr. Wahi obtained a history from Claimant. She reported that she had been able to work part-time until approximately two months earlier when she noticed that it was becoming increasingly harder for her to lift the 70 pounds required by her job. (Tr. at 242). Claimant stated that she could only lift up to 20 pounds. She also complained that even working just two days per week was taxing, causing fatigue and joint pain, particularly in her knees. The pain in her knees also affected her ability to climb stairs. However, she did not have significant trouble sitting or driving. In addition to knee pain, Claimant reported having pain in her feet, ankles, and wrists, with her left wrist having the most severe pain. Claimant indicated that she had trouble performing daily

9

activities, such as vacuuming and washing her hair, due to pain. (Tr. at 243).

Dr. Wahi reviewed Claimant's treatment records from Dr. Snyder and performed a physical examination. (Tr. at 244). In general, Claimant appeared alert, fully-oriented, and cooperative. She was moderately obese and her blood pressure was 130/84. Examinations of Claimant's head, neck, lungs, heart, and abdomen were normal. With respect to the musculoskeletal system, Claimant demonstrated a normal gait and station. (Tr. at 245). She could get on and off the examining table without difficulty. She could squat, toe walk, and heel walk, but all of these elicited considerable pain. Claimant's joints showed normal sensation and reflexes, but movement was accompanied by pain. Nonetheless, her range of motion was normal. Her fine manipulation was intact, and her grip strength was 5/5 bilaterally. Claimant's cervical and lumbar spine had normal range of motion, although there was an increase in lumbar lordosis. Dr. Wahi diagnosed Claimant with obesity and generalized osteoarthritis. He opined that Claimant had significant aches and pains in her joints, without loss of range of motion. However, he felt the pain would prevent her from doing sustained physical activity, although she was capable of part-time work in a light setting. (*Id.*).

On June 25, 2012, non-examining agency consultant, Karen Sarpolis, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. at 56-57). She opined that Claimant could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand, walk, or sit about six hours each in an eight-hour work day; and had unlimited ability to push and pull. (Tr. at 56). She based this opinion on Claimant's diagnoses of obesity and generalized osteoarthritis, which required regular, but conservative treatment. Dr. Sarpolis found Claimant only partially credible, pointing out that Claimant stated she could not stand for prolonged periods of time, but listed one of

her hobbies as walking. Dr. Sarpolis felt the record showed that Claimant could "stand a normal amount with normal breaks." (Tr. at 56). Dr. Sarpolis also noted that Claimant's treating source, Dr. Snyder, believed Claimant could perform light work.

Dr. Sarpolis added that Claimant had postural limitations in that she could only occasionally climb ladders, ramps, stair, ropes, and scaffolds; and could only occasionally bend, stoop, kneel, crouch, and crawl. However, Claimant had no manipulative, visual, communicative, or environmental limitations. (Tr. at 57).

On October 18, 2012, non-examining agency consultant, Uma Reddy, M.D., performed a second Physical Residual Functional Capacity Assessment. (Tr. at 65-67). Dr. Reddy agreed with Dr. Sarpolis's opinions regarding Claimant's exertional capabilities, credibility, and postural limitations. Dr. Reddy also agreed that Claimant had no visual or communicative limitations. (Tr. at 67). With respect to Claimant's environmental limitations, Dr. Reddy opined that Claimant should avoid concentrated exposure to extreme temperatures, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 67).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Claimant's first challenge to the Commissioner's decision involves the weight the ALJ gave to agency consultant, Dr. Wahi's, opinion that Claimant was unable to do sustained physical activity, but could work part-time in a light setting. Claimant's second challenge is to the adequacy of the ALJ's credibility analysis. Having thoroughly reviewed and considered the ALJ's written decision and the evidence of record, the undersigned **FINDS** Claimant's challenges to be without merit.

### A.  *Dr. Wahi's Opinion*

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

12

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling

weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In this case, the ALJ explicitly addressed the opinions of each medical source that in some measure assessed Claimant's functional capacity. First, in regard to Dr. Wahi's opinion that Claimant was unable to perform sustained physical activity and could function only part-time in a light setting, the ALJ gave no weight to the opinion. (Tr. at 18-19). The ALJ explained that the opinion was inconsistent with Dr. Wahi's examination findings, which the ALJ had outlined previously in the written decision. Most notably, Dr. Wahi observed Claimant to have a normal gait and station, normal bilateral upper extremity grip strength, intact fine manipulation, normal sensation and reflexes, normal range of motion of all joints and of the spine, an ability to toe and heel walk, and the ability to get on and off the examining table without difficulty. (Tr. at 15). Claimant complained of pain, but took no narcotic pain medication. (Tr. at 17-18). The ALJ concluded that Dr. Wahi must have relied heavily on Claimant's subjective reports and uncritically accepted them as true. Furthermore, the ALJ indicated that Claimant's "robust and varied" activities, both those listed in her function report and those described in her testimony, refuted the severity of functional limitation reflected by Dr. Wahi's opinion.

Second, the ALJ considered Dr. Snyder's opinion expressed in the Return to Work/Light Duty Medical Certification form he completed at Claimant's request on April 10, 2012. (Tr. at 19). The ALJ acknowledged Dr. Snyder's belief that Claimant could perform at a light level with occasional bending, standing, and walking and with lifting limited to no more than 30 pounds. The ALJ gave this opinion great weight based upon Dr. Snyder's treatment relationship with Claimant and also based upon the consistency of the opinion with the evidence as a whole. The ALJ emphasized that Dr. Snyder's opinion was, in fact, less restrictive than the RFC finding ultimately reached by the ALJ. (*Id.*).

Next, the ALJ considered the opinions offered by the two non-examining agency consultants, Dr. Sarpolis and Dr. Reddy. (Tr. 19). After summarizing their main points, the ALJ stated that while he gave both opinions substantial weight, he gave more weight to the opinion of Dr. Reddy. He explained that the opinions of both physicians were entitled to significant deference, because the physicians were knowledgeable about the Social Security disability program and supported their opinions with explanations. Although neither physician examined Claimant, both conducted a thorough review of the records and provided consistent opinions. Nevertheless, the ALJ felt Dr. Reddy's opinion was entitled to more weight because she had "a greater longitudinal perspective of the claimant's condition" and her finding of additional environmental limitations were, in the ALJ's mind, more reflective of the evidence as a whole. (*Id.*).

Certainly, from examining the manner in which the ALJ approached, analyzed, and assessed the medical source opinions, and then explained the weight given to them, the undersigned finds no apparent deviation by the ALJ from applicable Social Security rulings and regulations. The ALJ considered each source's relationship with Claimant, the

internal and external consistency and supportability of the source's opinion, and other factors that might affect the weight of the opinion. The ALJ gave significant weight to the opinion of Claimant's treating physician and to non-examining consultants whose opinions were not inconsistent with the treating physician's opinion.

Despite what appears to be a compliant, well-reasoned evaluation of the medical source opinions, Claimant points to particular aspects of the analysis that she feels demonstrates its flaws. First, she argues that Dr. Wahi was the only physician to perform a comprehensive examination of Claimant; therefore, the ALJ had no basis upon which to reject his opinion. Of course, this argument is simply incorrect, both legally and factually. Dr. Snyder also examined Claimant—on multiple occasions. Considering that Dr. Snyder was Claimant's treating physician, it is likely that his examinations were at least equivalent to the single examination performed by Dr. Wahi. In any event, although the opinions of an examining medical source should generally be given more weight than those of a non-examining source, the ALJ is authorized to depart from the standard pecking order when there are good reasons to do so. Here, the ALJ felt that Dr. Wahi's opinions were so at odds with his clinical findings that his opinions could not be fully trusted. Lack of consistency and supportability are two very good reasons to reject a medical source opinion.

Claimant also asserts that the ALJ misunderstood the opinion expressed by Dr. Snyder in the Return to Work/Light Duty Medical Certification form he completed on April 10, 2012. Claimant contends that Dr. Snyder plainly meant that Claimant could perform light work, but *only* on a part-time basis, a qualifier that the ALJ failed to appreciate. (ECF No. 10 at 2). In support of this interpretation of Dr. Snyder's opinion, Claimant relies upon the FMLA certification completed by Dr. Snyder in February 2012

16

(before the alleged onset of disability), as well as a notation in Dr. Snyder's office record confirming that Claimant was working part-time when the April 2012 certification was issued. According to Claimant, when viewing the April opinion in the context of these two documents, it is clear that Dr. Snyder meant his opinion to apply to Claimant's ability to perform work on a part-time basis. (*Id.*).

Having considered this argument, the undersigned disagrees with Claimant's analysis for two reasons. First, no logical bridge connects the FMLA certification to the Return to Work/Light Duty Medical Certification form, as the purpose of each document was quite different. The FMLA certification was prepared by Dr. Snyder to support Claimant's October 2011 request for a leave (or leaves) of absence from work. In contrast, the Return to Work/Light Duty certification was Dr. Snyder's verification that Claimant was capable of *returning to work* as long as her job duties were restricted in the manner specified on the form.

Second, Claimant's interpretation of Dr. Snyder's opinion is pure conjecture. For one thing, the opinion itself makes no mention of a part-time restriction. This is notable given that Dr. Snyder had previously restricted Claimant to a two-day work schedule for a period of three months when her job required her to regularly lift and carry more than fifty pounds. Accordingly, when Dr. Snyder intended to limit the number of days that Claimant was permitted to work, he explicitly included such a limitation. However, in the Return to Work/Light Duty Medical Certification form, Dr. Snyder made no such restriction. One can logically conclude that Dr. Snyder decided to change tactics in April 2012. Rather than addressing Claimant's impairments by limiting the number of days she could work, he restricted the exertional level of her job duties and imposed postural limitations.

Dr. Snyder's altered approach makes sense in view of Claimant's work history. The record indicates that Claimant voluntarily worked on a part-time basis nearly her entire career with the United States Postal Service, which spanned twenty one years. (Tr. at 38, 167).[1] Nothing in the record suggests that Claimant worked this limited schedule, because she was physically unable to work a full forty-hour week. Indeed, at the administrative hearing, Claimant admitted a longstanding preference for part-time employment, even transferring from one Post Office to another in order to secure a part-time slot. (*Id.*). However, her desire to work part-time is not the measure of her capacity to engage in work-related activities for Social Security disability purposes. In her Work History Report, Claimant indicated that she was an hourly employee and, over the years, worked as many as six days per week, between four and twelve hours per day. (Tr. at 168). In the months prior to leaving employment, Claimant's typical shift ran five hours beginning at 5:30 a.m. (Tr. at 38). On the morning shift, Claimant was required to pull in cages of mail and unload and sort all of the sacks, pods, and loose mail in the cages, which required lifting loads as heavy as fifty to seventy pounds. (Tr. at 37-39). After completing these tasks, Claimant would attend to customers at the window, where most of the time, she was required to lift no more than twenty pounds. (Tr. at 39). In January 2012, Dr. Snyder placed Claimant on a work restriction of two evening shifts per week, for a period of three months. Claimant was not satisfied with that arrangement and requested a return to light duty. Logically, then, the purpose of the April 2012 Return to Work/Light Duty Medical Certification form was to confirm from a medical standpoint that Claimant could resume her regular schedule, but should not be required to perform the more physically-taxing

---

[1] Her earnings record for the years 1996 through 2011 shows annual wages ranging between $22,095.53 in 2002 and $69,885.94 in 2004, likely reflecting the variations in her part-time schedule. (Tr. at 138).

duties of the position. Claimant corroborated as much at the administrative hearing when she testified that she stopped working at the Post Office in April, not because of the number or length of her shifts, but because light duty work simply was not available there. (Tr. at 41). Thus, contrary to Claimant's *post hac* rationalization, Dr. Snyder's Return to Work/Light Duty Medical Certification form should be interpreted exactly as it is written. That is, that Dr. Snyder believed that Claimant was capable of performing light duty work with certain express restrictions, which did not include any limitation related to the number of hours or days she was capable of doing light level duties.[2]

Finally, Claimant attacks the weight given by the ALJ to the opinions of Dr. Sarpolis and Dr. Reddy, because they did not review or rely upon key objective evidence available in the record. Specifically, Claimant argues that January 17, 2012 x-rays of her knees showed moderate degenerative changes and April 23, 2012 x-rays of her feet showed mild degenerative changes, some navicular spurring, and minimal changes of osteoarthritis. (ECF No. 10 at 3). Claimant contends that the x-ray reports were not available in the file at the time of Dr. Sarpolis's review; therefore, she did not consider them. On the other hand, the reports were available to Dr. Reddy, but she made no mention of them. In Claimant's view, the lack of attention given to the x-ray reports by the non-examining experts substantiates that their opinions were not based upon all of the significant evidence and, consequently, were unreliable.

---

[2] Even if Dr. Snyder presumed that Claimant would be working a part-time schedule, "that work 'may show that [the claimant] is able to do more work than [he or she] actually did.' ... Work activity that is not both substantial and gainful is still 'evidence relevant to the severity of [the claimant's impairment[s],' and as such must be considered in assessing the severity of a claimant's symptoms." *Sherman v. Colvin*, No. 4:13-CV-00020, 2014 WL 3344899, at *8-9 (W.D. Va. July 8, 2014) (citing 20 C.F.R. § 404.1529(c)). Therefore, the ALJ properly considered Dr. Snyder's opinion regarding the exertional level of work Claimant was capable of performing in making an administrative finding of Claimant's RFC.

Claimant's challenge on this ground must fail because its underlying premise is fallacious. There is no evidence in the record justifying Claimant's presumption that the x-rays constituted "key" evidence, let alone key evidence that undermined or conflicted with the opinions of Dr. Sarpolis and Dr. Reddy. The x-rays of Claimant's feet showed minimal osteoarthritic and degenerative changes, and the x-rays of her knees showed, at worse, moderate degenerative changes. (Tr. at 251, 258). Claimant offers no rationale for how these x-ray findings reasonably would or should have altered the RFC assessments of Dr. Sarpolis or Dr. Reddy, both of whom opined that Claimant could only occasionally climb ladders, ramps, stair, ropes, and scaffolds; could only occasionally bend, stoop, kneel, crouch, crawl; and could stand and walk six hours out of an eight-hour work day. Claimant also argues that the ALJ should not have relied upon the opinions of Dr. Sarpolis and Dr. Reddy because they failed to consider or incorporate the x-ray findings. However, Claimant simultaneously contends that the ALJ should have adopted opinions from Dr. Wahi, although he likewise made no mention of the x-rays. Such a position is untenable. The ALJ conducted a thorough review of the evidence, including the medical source opinions, and properly weighed them. He then provided good reasons for the weight given to each opinion. Therefore, the undersigned **FINDS** that the ALJ did not err in the weight he gave to the medical source opinions, including the opinion expressed by Dr. Wahi.

### B. Credibility Analysis

Social Security regulations and rulings require an ALJ to evaluate the credibility of a claimant's statements concerning pain and other symptoms using a two-step process. 20 C.F.R. § 404.1529. First, the ALJ must ascertain whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's alleged pain and symptoms. *Id.* § 404.1529(a). A claimant's

"statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's impairments could be expected to produce the alleged pain and other symptoms, the ALJ must evaluate the intensity, persistence, and severity of the pain to determine the extent to which it prevents the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the pain and symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, *id.* § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms.

21

*Id.* § 404.1529(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at \*4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at \*6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at \*5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at \*6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at \*7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the

weight given to the individual's statements." *Id.* at *4. Thus, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court studies the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ acknowledged the two-step process and began by examining Claimant's allegations. The ALJ noted Claimant's testimony that she could no longer work for the Postal Service due to the lifting, bending, and repetitive work required of the job position. (Tr. at 17). In addition, Claimant stated that she had intense pain in her feet when she walked a lot; pain in her shoulder when scrubbing, digging potatoes, and lifting; pain in her knees when she got up and down; and pain in her wrists, especially her left wrist, making it difficult to lift and to open jars. The ALJ agreed that Claimant's medically determinable impairments could reasonably be expected to cause pain and functional limitations; however, the ALJ did not find Claimant to be fully credible to the extent Claimant described the pain as debilitating. (*Id.*). The ALJ explained the while Claimant had generalized osteoarthritis and obesity, the objective findings did not support disabling symptoms. Claimant's knee x-rays showed only mild to moderate changes, and

an EMG study revealed only mild left carpal tunnel syndrome. In addition, the ALJ did not feel that Claimant's medical treatment corroborated a claim of disability. (*Id.*). The ALJ pointed out that Claimant had received conservative and routine treatment from a primary care physician, despite having medical insurance that would have allowed her more options. The ALJ emphasized that Claimant used only over-the-counter Motrin for pain management, which she reported relieved her pain and swelling. She did not use narcotic pain medication, as might be expected with severe, disabling pain. Furthermore, she had no side effects from her over-the-counter medications.

The ALJ also discussed Claimant's self-described activities, which were not limited to the extent consistent with disability. Claimant reported attending to her grooming needs, taking daily walks, cooking meals, attending church, walking to the barn and caring for her chickens and goats, doing laundry, washing dishes, vacuuming, managing the household finances, using the computer, driving, shopping, watching movies, and doing yard work. (Tr. at 18). Moreover, the ALJ found Claimant's testimony at the administrative hearing to weigh against a finding of disability. Claimant appeared energetic and responded in the affirmative to all of the ALJ's questions regarding her ability to perform daily activities. (Tr. at 18). As the transcript reflects, Claimant agreed that she could walk a city block; stand a couple of hours; sit two or three hours or longer; push and pull with both hands; reach over her head; handle things with her fingers; pick up things; feel temperature, size, and shape; pedal with her feet; occasionally climb stairs; touch her knees with her hands; balance; drive; cook; shop; do laundry; make the beds; vacuum; take out the garbage; clean and dust the house; garden; cook; and mow the grass on a riding mower. (Tr. at 41-44).

The ALJ considered all of the relevant factors in assessing the credibility of

Claimant's statements regarding the severity of her symptoms and fully complied with the governing law. He explicitly addressed Claimant's activities, symptoms, factors that allegedly aggravated her symptoms, objective findings, medications, treatment, and side effects of treatment. The ALJ provided a logical and comprehensive explanation of his credibility assessment that was supported by specific citations to the evidence. For all of the reasons stated by the ALJ, his conclusion that Claimant was not credible to the extent she claimed that her symptoms were disabling is supported by substantial evidence. Consequently, the undersigned **FINDS** that the ALJ performed an adequate credibility analysis.

**VIII.** **<u>Recommendations for Disposition</u>**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 7); **GRANT** Defendant's motion for judgment on the pleadings (ECF No. 9), **AFFIRM** the final decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  January 8, 2016

Cheryl A. Eifert
United States Magistrate Judge